Monell, J.
The question in this case arises between the plaintiffs and the general creditors of Troost, Schmidt & Co., represented by their assignees, Messrs. Buckley and Mozle. The property in question, or its proceeds, passed to the assignees under the general assignment, and is held by them upon the trusts therein declared.
If a general partnership, or what was in the nature of a general partnership, existed between the plaintiffs and Troost, Schmidt & Co., under the agreement of January, 1864, in respect to the transactions conducted under such agreement, then the property of such partnership must be applied to the payment of the partnership debts. If, however, each shipment was intended and understood to be a single and independent transaction, having no connection with any others preceding or following it, then, as claimed by the defendants, the plaintiffs have no equity to be protected against their liability upon the bills in question.
The relation of the parties is to. be ascertained, first, from the agreement, and second, from the course of business transacted under it.
That a general partnership may exist in respect to a single adventure, cannot be doubted, (Collyer on Part. § 17, 55;) and it may also be made to extend over any number of adventures agreed upon by the parties. Under such an agreement the partnership becomes general, only for the purpose of such adventure or adventures, and for no other purpose, and it subjects the partners to all the liabilities, and gives them all the rights of general partners in the particular adventure. (Heyhoe v. Burge, 9 Com. B. 431. Salomons v. Nissen, 2 T. Rep. 675.)
*522 To constitute a general partnership, nothing more is necessary than that the parties agree to carry on or conduct a specified business, and to share in its profits and losses. The business may be of a general nature, or it may relate and be confined to certain designated transactions. In either case the partnership becomes general.
In this case the parties agreed to carry on a business between Calcutta and New York, upon joint account. The particular kind of business was the shipment of goods (the description not designated) from Calcutta, for sale in New York. They provided for the mode of payment; the manner of sale; the division of profits, and the sharing of losses. No period of duration was prescribed, and there was no limit to the amount or number of shipments. Under such an agreement it cannot be doubted that the parties became general partners.
But it is claimed that such partnership was limited and confined to each shipment, and that any liability incurred for one shipment could not attach to another; and in support of this the clause in the agreement, “ that the profit and loss shall be equally divided between the parties, and settled in New York upon the winding up of each shipment,” is relied upon.
It was doubtless the intention of the parties that there should be frequent and speedy settlements, and that their transactions should not run for any great length of time without being closed. It was for the interest, and probably for the convenience, of both, that returns should be made upon the termination of each adventure. The house in Calcutta was interested in receiving its share of the profits, and the house in New York in being reimbursed for any loss. Hence, they provided that any .deficiency in the sale of goods, upon which advances had been made, should be collected from the owners in Calcutta, and any losses arising from remittances to England should be borne equally. So far, therefore, as it was practicable or possible, each shipment was to be wound up, and its results ascertained. Other *523 parts of the agreement, however, seem to' indicate quite clearly that the provision I have quoted was not designed to control the manner of doing business, or to absolutely require the complete isolation of each shipment, so as to render it a separate transaction not to be affected by any other. The goods were to be purchased and'shipped in the discretion of the parties in Calcutta, and sold in the discretion of the parties in Yew York. The latter were to remit to meet the bills drawn against the shipments, at the time of sale, whether before or after the bills became due. It might happen that bills would mature before favorable sales could be made, and the bills go to protest with the .goods on hand; and it could not, therefore, have been the intention to deprive the parties of the right, as it seems to me it would have been their duty, to take any other of their joint property to meet their engagements. Besides, the winding up of each shipment is, in express terms, confined and restricted to the settlement of the profits and losses of such shipment, and not to the payment of bills drawn against the same.
The agreement, therefore, did not, in my opinion, make each shipment a separate transaction, so as to take from it any of the characteristics of a general partnership as to all.
The course of business also gave a construction to the agreement. The answer admits that at the time of the assignment there were on hand, unsettled, “ various shipments made under the arrangement,” and that the goods and assets mentioned in the schedule annexed to the complaint were portions of such shipments remaining undisposed' of. Such portions were the remnants of distinct shipments by seven different vessels, arriving at different periods, none of which had been closed or settled. Besides, goods sent by the Medusa and Audubon, against which the drafts in question had" been drawn, were long since sold and the avails used in paying-other bills.
Thus the parties in Yew York did not practically admit any obligation to separate each transaction, or to close each distinct shipment.
*524 It is clear, therefore, I think, both from the agreement and the course of business under it, that the parties intended their relations to the business should be that of general partners, subjecting themselves to all the liabilities of partners, with their corresponding rights.
From this conclusion it necessarily follows that any goods or assets in the hands of the New York parties, being the property of the joint enterprise whenever shipped, must be applied to the payment of the joint debts. (Smith v. Wriqht, 1 Abb. Pr. Rep. 243.)
The defendants Buckley and Mozle are mere trustees, and not purchasers. They acquired no other right or title-to the property in question than their assignors, Troost, Schmidt & Co., had. In the hands of the latter, equity would give the creditors of the Calcutta and New York firms a preference over the individual debts of either, and the goods or assets must be subjected to the same equity in the hands of their assigns.
The plaintiffs, therefore, are entitled to an account from the defendants Buckley and Mozle of all property and assets which came into their possession under the assignment, and which was derived from the joint adventures of the plaintiffs and Troost, Schmidt & Co., for which purpose there must be a reference.
The plaintiffs must also have judgment, that out of said assets and property, if sufficient, the said assignees pay to the plaintiffs the amount of said outstanding drafts, or so much thereof as said assets and property will pay; and if any balance remains, that said assignors pay to the plaintiffs their costs of this action, to be taxed, together with the one equal half of the residue, if any.